LAWRENCE SYSTEMS, INC., Plaintiff,

v.

Ubaldino RAMIREZ DE ARELLANO and
Franz Philippi, Sr., Defendants and
Third-Party Plaintiffs,

v.

FIRST NATIONAL CITY BANK,
Third-Party Defendant.

Civ. No. 332–73.

United States District Court,
D. Puerto Rico.

March 12, 1976.

Baker & Woods, Santurce, P. R., for plaintiff.

Benjamin Rodriguez Ramon and Teodoro Peña Garcia, Hato Rey, P. R., for defendants and third-party plaintiffs.

McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P. R., for third-party defendant.

## OPINION AND ORDER

TORRUELLA, District Judge.

This is a civil action wherein Plaintiff Lawrence Systems, Inc. (hereinafter called "Lawrence"), a corporation engaged in a field warehousing and accounts receivable operation with principal offices in San Francisco, California, is asserting a claim against Defendants Ubaldino Ramírez de Arellano and Franz Philippi (hereinafter called "Defendants"), individual persons who are residents of Mayaguez, Puerto Rico and who are also officers and stockholders of Western Sugar Refining Company (hereinafter called "Western Sugar") a Puerto Rican corporation engaged in the refining of sugar in Mayaguez, Puerto Rico. The suit is based on a so-called indemnity contract wherein it was allegedly agreed that Defendants would pay Lawrence for any losses suffered by it by reason of its warehousing certain goods for Western Sugar which the latter deposited with Lawrence as part of a financing arrangement with the First National City Bank (hereinafter called the "Bank").

Thereafter, Defendants brought a third party complaint against the Bank claiming that any losses suffered by Lawrence were caused by the negligence of the Bank or by reason of its breach of contracts existing with Western Sugar.

Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the subject matter of this controversy by reason of the diversity of citizenship of the parties and the amount in dispute being in excess of $10,000, exclusive of costs.

### Background

The Bank has been financing Western Sugar's refined sugar production since approximately 1932. At times the amounts lent to Western Sugar have been as high as $4,500,000.

Up to the 1970 sugar season ("zafra") the financing was based on warehouses certificates issued upon the refined sugar stored by Western Sugar in its own warehouses. These certificates were issued by Western Sugar's own employees and were accepted as valid by the Bank.

During the 1970 season the Bank discovered that there were differences between the stated collateral as represented by the refined sugar certificates and the actual stores backing the certificates present in Western Sugar's warehouse.

In view of this situation the Bank sought out Lawrence and prevailed upon Western Sugar to engage its services as a field warehouser, as a condition to any further financing of Western Sugar's refined sugars.

### The Agreements

On September 22, 1970 Western Sugar entered into a field warehouse storage agreement with Lawrence (Exhibit 1). Under the terms thereof, which are contained in a standard printed form prepared by Lawrence, Lawrence agreed to warehouse "refined sugar in bags" in a warehouse located in Western Sugar's premises at certain established rates.

The second page of this contract contains an additional printed agreement, which reads as follows:

"AGREEMENT

"Date September 22, 1970

"In connection of the execution by Lawrence Warehouse Company of the foregoing and attached Field Warehouse Storage Agreement, and such other related agreements or undertakings as may be necessary, including any lease or leases of necessary storage space and facilities,

with WESTERN SUGAR REFINING COMPANY, hereinafter referred to as the depositor

"We, the undersigned, as officers, agents, directors, or shareholders of, or as partners in, the depositor, or as a person or persons otherwise interested in the depositor, jointly and severally unconditionally agree to indemnify and hold harmless Lawrence Warehouse Company against any loss, damage, claim or liability asserted against it by reason of or in connection with any warehouse receipt or warehouse receipts issued by Lawrence Warehouse Company, evidencing or purporting to evidence the deposit of goods in any warehouse or warehouses operated under said Field Warehouse Storage Agreement, or for any actual loss of or damage to commodities stored or tendered for storage with Lawrence Warehouse Company, including but not limited to the diversion of or the taking from or out of such warehouse any commodities, with or without collusion on the part of any agent or employees of Lawrence."

This agreement was signed by Defendants in their individual capacities at the same time that the storage agreement was executed. It is this agreement that is the subject of the present dispute.

Simultaneously with the execution of the storage agreement Lawrence and Western Sugar entered into a certified accounts receivable service agreement (Exhibit 2) whereby Lawrence agreed to act as accounts receivable manager in favor of Western, thus allowing the latter's receivable to be assigned to the Bank as collateral for bank loans. This agreement is also a printed form utilized by Lawrence in its normal operations. Again it contains in page 2 thereof, an additional agreement signed contemporaneously by Defendants individually, and similar in content to the one formerly transcribed herein above.[1]

On the same date, a certain "Certified Accounts Receivable Service Agreement— Three Party—"was executed between Lawrence, the Bank and Western Sugar in order to instrument the assignment of accounts receivable from Western Sugar to the Bank, via Lawrence (Exhibit 3).

*Subsequent Events*

On September 29, 1970 Lawrence proceeded to hire Isidoro Rosado (hereinafter called "Rosado") as its warehouse and accounts receivable manager to administer the storage and receivable agreements with Western Sugar. For thirty-odd years prior thereto Rosado had worked with Western Sugar as an accountant and also as its assistant manager.

Upon being hired Rosado received specific written instructions from Lawrence (Exhibit 6–9) which where agreed and accepted to by Western Sugar (Exhibit 8). In substance the instructions implemented Lawrence's control over the commodity subject of the agreements, and established procedures for the issuance of the corresponding warehouse receipts. They also provided periodic reporting and accounting procedures by Rosado to his Lawrence supervisors.

The parties to the storage and receivable agreements proceeded to operate thereunder. From September 22, 1970 to February 27, 1971 the only commodity stored in the mentioned warehouse and covered by the

---

1. It reads as follows:

"AGREEMENT

"In consideration of the execution by Lawrence Warehouse Company of the foregoing and attache Agreement, and such other related agreements or undertakings as may be necessary with WESTERN SUGAR REFINING COMPANY, hereinafter referred to as the Borrower,

"We, the undersigned, as officers, agents, directors or shareholders of or partners in, the Borrower or a person or persons otherwise interested in the Borrower, jointly or severally, unconditionally agree to indemnify and hold harmless Lawrence Warehouse Company against any loss, damage, claim or liability asserted against it by reason of or in connection with any Accounts Receivable Certificate or Certificates issued by Lawrence Warehouse Company evidencing or purporting to evidence, the validity of accounts receivable assigned by the Borrower or by reason of Borrower's failure to apply the proceeds derived from such receivables in accordance with written instructions provided by Lender to Lawrence and Borrower."

storage. agreement, was refined sugar in bags.

Meanwhile, on October 13, 1970 Western Sugar acknowledged indebtedness to the Bank in the amount of $4,575,000 and granted a lien to it "on all sugars acquired" by Western Sugar (Exhibit PP). In this document, the parties specifically defined this term:

"All sugars acquired means all sugars produced by Western and all additional raw sugars bought from other mills totally or partially paid for by Western."

From February 27, 1971 on, Rosado was instructed by Lawrence to receive raw sugar that was acquired by Western Sugar from various sugar mills. Although Lawrence and Western Sugar did not execute any new agreements for the storing and financing of raw sugar, in practice they followed procedures similar to those established for the refined sugar in bags, except those differences caused by the fact that raw sugar is handled in bulk.

Defendants did not sign any new agreements with Lawrence specifically holding Lawrence harmless from losses related to raw sugar, nor is there any evidence that this was discussed between them.

As regards raw sugar, Rosado was authorized by his supervisors to deliver to Western Sugar for refining up to 500 tons per day of raw sugar, for which he had to receive from Western Sugar an amount of refined sugar for deposit in the warehouse equal in value to 90% of the value of the raw sugar released for refining (Exhibits 16 and 17).

Through August 9, 1971 Rosado's weekly written reports to his supervisors showed prima facie compliance with these instructions. In the meantime, Lawrence's cursory and sporadic inventories [2] failed to reveal any discrepancies between the stocks of raw sugar in the warehouse and Rosado's reports.

In actual practice Rosado had not been complying with Lawrence's instructions regarding the 90% ratio and this came to light on August 9, 1971 when his reports showed a considerable numerical shortage in the refined sugar stocks that were warehoused, as compared to the raw sugars he had delivered to Western Sugar.[3] This shortage had been building up since February 1971 and had been caused by the fact that the actual consumption of raw sugar required to produce the refined product was 115% for each pound of raw sugar. To meet the deficit in refined sugars created by the requirements of the 90% replacement formula, Rosado had in part been using the raw sugars deposited in the warehouse by Central Igualdad for refining by Western Sugar. Central Igualdad being a separate entity unrelated to the parties herein, as the sugar season progressed its raw sugar had to be "returned" or replaced with its refined sugar. Thus, as relates to Western Sugar, Rosado ended up with a shortage of refined sugar, according to the 90% formula, which shortage was attributed to "refining" loss previously described.

On several occasions during the course of the 1971 season this discrepancy was called to the attention of the Bank by Western Sugar in an attempt to get from them a change in the 90% formula to reflect the realities of sugar refining. The Bank refused to accede to these requests.

Rosado's report of August 9, 1971 was forwarded to Lawrence's District Manager in San Juan, who upon discovering the shortage called the assistant vice president in Miami, Anthony Angulo. Angulo came to Puerto Rico and met with Joaquín Bofil, the Bank official who was in charge of Western Sugar's account. Thereafter, he

---

2. Between February and August, 1971, Lawrence inspected the Warehouse on only four occasions, and then only for short periods of time (Exhibit A B). The method used for determining the raw sugar stocks is by sight calculation. None of these auditors had any prior experience in the sugar industry.

3. At that point 2,413,922 pounds of raw sugar had been delivered to produce 606,305 c.w.t. of refined sugar.

called Defendant Ramírez de Arellano and arranged to meet with him.

The meeting took place on August 23, 1971 at Western Sugar in Mayaguez and in it Defendant Ramírez de Arellano accepted that there was a deficit and explained the reason thereof. He also stated to Angulo that Western Sugar's reserve account with the Bank was sufficient to cover any shortage. A meeting was arranged with Bank officials to discuss this situation.

At this meeting, which was attended by several Bank Officials as well as Angulo, Defendant Ramírez de Arellano again blamed the situation on the conversion formula allowed by the Bank. Furthermore he realleged that there were sufficient funds in Western Sugar's reserve account (also known as the "factor's lien account") to cover the deficit. The Bank agreed to look into this contention. Several days later Bank officials indicated that they were not agreeable to this request, alleging that the funds had to be used for the payment of other obligations.

At the time of these meetings there were in fact sufficient funds in the factor's lien account to cover Western Sugar's so-called refined sugar deficit. The purpose of this account was to cover any amounts owed to the Bank by Western Sugar and we are not convinced by the reasons given by the Bank for not complying with Defendants' request in this respect.

From March, 1972 to December, 1972 the Bank claimed from Lawrence various amounts of money, originally totalling some $167,000.00, for the alleged shortages and for accounts receivable allegedly mismanaged by Rosado. Lawrence, in turn, requested indemnification from the Defendants for the amounts claimed to it by the Bank. The Defendants denied liability for any payments under their agreements with Lawrence, and specifically instructed Lawrence not to pay the Bank's claim.[4] Despite the Defendants' specific instructions that the Bank's claims should not be paid, Lawrence settled the same with the Bank for $146,797.33 on December 22, 1972. The Defendants did not intervene, neither did they acquiesce to said settlement.

During the time the Bank was claiming from Lawrence the amounts that culminated in mentioned settlement of December 22, 1972, the Bank was also claiming from Western Sugar various amounts of money. For raw sugar pledged, the Bank claimed from Western Sugar $44,107.51. No claim was made by the Bank to Western Sugar for accounts receivable mismanaged by Lawrence between February and August, 1971. The Bank filed judicial action against Western Sugar for mentioned amounts, jointly with debits corresponding

---

**4.** See Exhibits I to K. In the letter Defendant Ramírez de Arellano wrote to attorney Agustín F. Fortuño, former attorney for Lawrence, dated October 19, 1972 (Exhibit I), Defendants warned Lawrence as follows:

"I believe it is fair that you give us this opportunity before Lawrence pays the bank its claim, which payment we do not accept, and if made, it would be upon the influence of the commercial relations between Lawrence and the First National City Bank."

Likewise, on December 1, 1972 Defendant Ramírez de Arellano wrote to Fortuño as follows (Exhibit J):

"For the above stated reason, we believe that Lawrence should not pay the Bank the claim, as we sincerely opine that they are taking advantage of the situation. Now, if they decide to pay for commercial reasons between both, we refuse all responsibility regarding said payment, since we believe said payment does not proceed in any form."

Mentioned letter was never answered by Fortuño, as appears from the first paragraph of Ramírez de Arellano's letter to him, dated December 20, 1972 (Exhibit K). In that letter Defendant Ramírez de Arellano again warns Fortuño as follows:

"I have heard comments that Lawrence is in the process of paying the claim to the Bank and that they intend later to bring suit against us. As you are the attorney for Lawrence, I want to advise you, that if legal proceedings are started against us, which we would consider vicious and unfair, we would have no other choice but to claim damages against the plaintiff, to protect our rights. We insist that the Bank's claim to Lawrence is unfair and contradictory to what they claim from us for the same concept, and that if Lawrence decides to pay the Bank it is only due to the commercial relationship existing between them."

to years prior to September, 1970, and compromised its claims with Western Sugar at 40% thereof. The Bank collected the percentage agreed upon from Western Sugar on December 31, 1974, on Western Sugar's Chapter XI proceeding in the Bankruptcy Court (Case Number B–76–72).

Lawrence, in turn, claimed also from Western Sugar the amount paid to the Bank in settlement of the Bank's claims, formerly referred to, and compromised the same with Western Sugar in the Bankruptcy Court, for 15% thereof, having collected from Western Sugar $22,240.97 and $706.56, for an aggregate of $22,947.53. Upon compromising said claims with Western Sugar, Lawrence did not obtain the Defendants' authorization, intervention or acquiescence.

■ It is axiomatic that in a diversity action such as the present one that applicable substantive law is that of the State wherein the action is commenced. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, the provisions of the Civil Code of Puerto Rico (31 LPRA 1 et seq.) are determinative of the rights of the parties herein.

■ Considering that the agreement in question was entered into in Puerto Rico and its execution was to take place therein, this codification of Puerto Rico's civil law, derived from the Civil Code of Spain, establishes the nature of the contract upon which Lawrence has sued Defendants. *Martínez v. Viuda de Martínez,* 88 DPR 443 (1963). Inquiry into the nature of this contract is of essence in deciding this controversy.

Lawrence contends that the contract in question is one of indemnity, while Defendants claim that it is a surety agreement. Lawrence relies principally on the proposition that a surety contract has three parties as distinguished from an indemnity agreement which has only two parties. Lawrence claims that the contract subject of this suit has only two parties and thus is an indemnity contract.

We can not agree with Lawrence's position.

■ The agreement here, physically forms part of the field warehouse storage agreement (Exhibit 1) and the certified accounts receivable service agreement (Two party) (Exhibit 2). Irrespective of how these documents are labeled, when read in their totality and in context, it is clear that by signing each so-called indemnity agreement, the parties intended that Defendants guarantee to Lawrence the performance by Western Sugar on the principal contracts of which they formed a part.

■ Section 1721 of the Civil Code (31 LPRA 4871) defines the contract of surety as one in which "a person binds himself to pay or perform for a third person in case the latter should fail to do so." In our opinion, the present agreements fall within this provision, regardless whether or not there is such a thing as an indemnity contract under our Civil Code, a discussion which we consider sterile under the circumstances. Cf. *F.D. Rich Co. v. Tribunal Superior,* 99 DPR 158, 174–175 (1970). See also "Fundamentos de Derecho Civil", 1956 Ed., Puig Brutau, Vol. II (No. 2), at page 529. Furthermore, even assuming that three parties are needed for the existence of such a contract this requirement is met by the concurrence herein of Lawrence, as creditor, Western Sugar, as debtor, and Defendants, as guarantors.[5]

■ Considering the above, we are obliged by the Civil Code to construe the agreement strictly in favor of the guarantors, Defendants. 31 LPRA 4876; *Battle v. Pereyó,* 67 DPR 662 (1947). In this respect, we are faced here with a standard printed agreement prepared by Lawrence, wherein at the time the parties executed the same they inserted in typewriting the words "refined sugar in bags" as the commodity to be warehoused. As we have previously discussed, at the time of execution of the warehousing contract and of the guarantee

---

5. It is interesting to note that the Complaint labels this suit as an "Action For Damages Against Guarantors."

by Defendants, the only commodity that historically had been financed by the Bank was *refined* sugar in bags. None other was contemplated at the time by the parties. Thus, a new expressed [6] guaranty agreement was required from Defendants before they could be subjected to pay Western Sugar's losses of *raw* sugar. 31 LPRA 4876. This new agreement was never entered into and therefore Defendants can not be held answerable to Lawrence.

 Additionally, particularly in view of the relationship between Lawrence and the Bank, Lawrence could not voluntarily pay the Bank without the acquiescence therein of Defendants. Under the Civil Code the payment by Lawrence to the Bank released Defendants of their obligation as guarantors of Western Sugar. See 31 LPRA 4896; also Manresa, "Código Civil", 5th Edition, Vol. 12, pp. 279–280; Scaevola, "Código Civil", 1953 Ed., Vol. 18, at page 600; Santa María, "Código Civil", Vol. 2, page 865. This situation is aggravated by the fact that in the present case, when Lawrence made the claim against Defendants in August, 1971, there were sufficient funds in the factor's lien account with the Bank to cover the refining loss. Western Sugar had a right to request that those surpluses be applied by the Bank to any of its debts. 31 LPRA 3176–3178. The Bank could not refuse said requests and at the same time claim payment from Lawrence. Considering that Lawrence was fully aware of this situation at the time of its compromise with the Bank, Defendants are not legally bound to Lawrence under the terms of their surety. 31 LPRA 4896.

In view of the above, we need not enter into other matters raised by Defendants, some of which may be meritorious.

The Clerk shall enter Judgment in accordance herein dismissing the Complaint and Third Party Complaint. Defendants

---

6. We hold that under the circumstances expressed herein, the language "other commodities acceptable to Lawrence will be warehoused", contained in Paragraph 2 of Exhibit 1, is not sufficient to create a surety obligation

are granted costs against Plaintiff and Third Party Defendant.

IT IS SO ORDERED.

---

from defendants. 31 LPRA 3478; *Torres v. Porto Rico Racing Corp.*, 40 DPR 441 (1930); *Zequeira v. CRUV*, 83 DPR 878 (1961); *CRUV v. Peña Ubiles*, 95 DPR 311 (1967); *Prieto v. Hull Dobbs Co.*, 88 DPR 420 (1963).