**FEDERAL DEPOSIT INSURANCE CORP., in its corporate capacity, Plaintiff,**

v.

**Jose R. RIVERA–ARROYO, Myrna Landron-Nater and the conjugal partnership established by them; Robert S. Prann, Evelyn Prann and the conjugal partnership established by them; Bracero & Rivera, Inc. and Development & Investment Corp., Defendants.**

No. Civ. 85–0282CC.

United States District Court, D. Puerto Rico.

Sept. 15, 1986.

Gabriel Hernández-Rivera, Feldstein, Felpi, Hernandez & Gotay, Old San Juan, P.R., for plaintiff.

José E. Rivera-Reyes, Rivera, Nieves & Ferrer, Hato Rey, P.R., Carlos A. Quilichini, San Juan, P.R., Eldia Díaz-Olmo, Rodriguez Ramon, Peña & Diaz, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action for foreclosure of mortgage and collection of certain promissory notes which the Federal Deposit Insurance Corporation (FDIC), in its corporate capacity, acquired as assets from a failed financial institution, Girod Trust Company (Girod), through the FDIC as receiver of Girod. The assets are related to a Loan and Pledge Agreement executed by Girod and Development and Investment Corp. (DI) to finance the construction of a housing project in Arecibo, Puerto Rico. The project was originally commenced by Bracero and Rivera, Inc. (B & R) and later continued by DI. Federal jurisdiction is premised on 12 U.S.C. § 1819 and 28 U.S.C. § 1345. The defendants are DI, Robert and Evelyn Prann and their conjugal partnership, as alter egos of DI, as well as B & R, José R. Rivera-Arroyo, his wife and their conjugal society as personal guarantors of B & R's debts. Codefendant DI *counterclaimed for breach of contract.*

The Loan and Pledge Agreement between DI and Girod appears to be the object of most of the counts of FDIC's amended complaint. Count I seeks recovery from DI for more than 1.6 million dollars, evidenced by several promissory notes, that were advanced to DI pursuant to the loan and pledge agreement. Count II refers to a $55,000 commercial loan granted by Girod to DI and the corresponding promissory note. Count IV asserts that a two million dollar mortgage note executed by B & R was pledged by DI to guarantee payment of the loans advanced to DI through the Loan and Pledge Agreement. It is also stated in this count that the two million note is in default as to payment of principal and interest, that it is payable on demand, and that FDIC is its current holder. On the other hand, count III appears to refer to some other agreement and seeks *in solido* liability from José R. Rivera-Arroyo, his wife and their conjugal partnership in lieu of a continuing

letter of guaranty executed by them on or about September 27, 1977 to secure any loans advanced to B & R by Girod. Count V is directed at Robert S. Prann, his wife, and their conjugal society as alter egos of DI for the latter's liability on a 3.6 million dollar loan negotiated and executed by Mr. Prann when the corporation was not yet registered and for which there exists a promissory note for approximately 1.4 million dollars and another one for $55,000. Notwithstanding the apparent separatedness of these claims, in terms of their origins and amounts, in its prayer for relief, FDIC joins the claims and requests *in solido* liability from all defendants as to counts I and II and execution of the mortgaged property.

Defendants have filed sundry motions to dismiss or for summary judgment challenging the claims on various grounds.[1] Plaintiff also seeks summary judgment on several claims and dismissal of DI's counterclaim. Currently pending are B & R's motion for summary judgment (docket entry 61); José R. Rivera-Arroyo, his wife and their conjugal partnership's motion for summary judgment (docket entry 68); FDIC's motion to dismiss the counterclaim (docket entry 49); FDIC's motion for partial summary judgment against DI (docket entry 75), as well as the oppositions and replies. We shall first examine the motions for summary judgment of Bracero and Rivera, Inc. and of the Riveras and their conjugal partnership.

In a motion which is not supported by sworn statements or copies of documents, B & R argues that it is not liable for its successor's (DI) debt with Girod because when DI took over the Arecibo construction project, assumed B & R's debt and obtained further financing from Girod, Girod released B & R from all of its prior liabilities. B & R refers to the pleadings and contends that there is no allegation stating the grounds for its liability and that there is no document establishing its liability *in solido* with DI. Relying on Puerto

---

1. On July 24, 1985 the Court denied a motion for summary judgment filed by codefendants

Robert and Evelyn Prann and their conjugal partnership.

Rican law on joint debtorship and novation through substitution of debtor, B & R argues that Girod tacitly accepted the new debtor and exonerated B & R of any prior debt. It also contends that none of the relevant documents, *i.e.*, the loan and pledge agreement between Girod and DI, state that B & R is a joint, *in-solido* debtor with DI.

Codefendants José R. Rivera-Arroyo, his wife and their conjugal partnership claim in their motion for summary judgment that the continuing letter of guaranty signed by them in September 1977, where they agree to be held personally liable for B & R's debts, did not extend to all loans made to B & R by Girod but only to those related to the "María del Carmen" housing project in Corozal which B & R was building at the time. These defendants filed sworn statements and copies of documents related to this guaranty as well as copies of an Opinion and Order of Judge Pérez-Giménez where the same letter of guaranty was interpreted in consonance with their position.

FDIC, in opposing B & R's position, submitted copies of several documents which show the nature of the transactions involved in some detail. According to these documents, in December 1981 Girod provided financing to B & R for the Arecibo housing project. To secure this debt, B & R's Arecibo property was mortgaged in the amount of $950,000, a transaction which is presumably embodied in deed number two hundred thirteen (213) of December 14, 1981 but of which there is no copy in the record. This mortgage was increased to two million dollars in deed number ten (10) of March 31, 1983, a document which is not part of the record either. The debt is evidenced by a mortgage note payable to bearer on demand and signed by José R. Rivera-Arroyo on behalf of B & R, copy of which was included in FDIC's opposition. On April 13, 1984, B & R sold the mortgaged property to DI who agreed to continue with the construction project. According to deed number seventeen (17) of that date, DI bought the Arecibo property for $1,316,046.97, B & R's debt at the time.

Instead of paying this amount, DI agreed to assume the debt in exchange for the property and retained the purchase price to pay the mortgage-secured debt when due. On May 18, 1984, Girod entered into a Loan and Pledge Agreement with DI whereby additional financing was provided to complete the project. In this Loan and Pledge Agreement, the two million mortgage note was also included as security in case of default.

As to the Rivera defendants and the challenge by their conjugal partnership to the scope of the 1977 letter of guaranty, FDIC argues that the guaranty's language clearly establishes that the Riveras agreed to personally bind themselves on any and all of B & R's debts with Girod. However, FDIC does not attach to its oppositions any documents or sworn statements regarding this matter. It does not refer to any document, other than the September 1977 letter of guaranty, to establish their personal liability nor does it rebut these defendants' documents in support of their claim that there are no outstanding debts by B & R on the Corozal project. FDIC admits that the amounts sought to be recovered in the present case are unrelated to the Corozal project. FDIC does not present any documents, except for those mentioned, or sworn statements showing B & R's acceptance of an *in solido* liability with DI as to any advances made by Girod after DI took over the Arecibo construction project and the Loan and Pledge Agreement was entered into.

■ We agree with the interpretation given by the Rivera defendants to the 1977 letter of guaranty. We also agree with Judge Pérez-Giménez' reasoning and interpretation of the guaranty. As shown by their documents, the letter of guaranty was issued pursuant to a contemporaneous loan and pledge agreement which was related to the financing of the María del Carmen project in Corozal. The language in the letter of guaranty, particularly the following sentences, supports this limitation in scope:

This is a continuing guarantee given in order to induce you to enter into, and make loans under a certain Loan and Pledge Agreement bearing even date herewith between you and Bracero & Rivera, Inc.—for the financing of the construction of a housing project in Corozal, P.R.,—and this guarantee will not be revoked by the undersigned until such time as the above-mentioned Loan and Pledge Agreement (as the same may be amended from time to time, which amendments may be made without the consent or notice of the undersigned) and all terms thereof shall be fully complied with by all parties and the housing project contemplated thereby shall have been fully completed.

The guaranty's reference to the loan and pledge agreement issued on the same day as well as the fact that the surety's maximum amount of liability is the same as that provided by the loan are also strong indicators that the obligations of the Riveras were circumscribed to those incurred by B & R in relation to the Corozal project. Plaintiff's reliance on the introductory language in the document,[2] as indicative that the surety would cover debts beyond those disbursed to complete that construction project, contravenes the guidelines for contract interpretation provided by the Civil Code. *See P.R. Laws Ann.*, title 31 sections 3471 (literal sense of contract's language prevails if the terms are clear), 3473 (general terms of the contract should not be interpreted as inclusive of things and cases different from those intended), 3475 (stipulation should be interpreted in relation to one another), as well as the guidelines provided by the common law, *see Restatement (Second) of Contracts*, sections 202, 203, 206 and 208 (1981). This introductory paragraph arguably reflects the drafter's desire to ascertain that the Rivera's be liable personally for any type of obligation

or debt incurred by B & R, no matter what the obligation was called or how it was designed, described or implemented. However, the reference to "any debt" cannot be isolated from the rest of the document which clearly limits it to debts incurred by B & R in relation to the construction of the María del Carmen housing project in Corozal. In addition, Puerto Rican law commands that a surety contract (*fianza*), such as the one here involved, "cannot be extended further than that specified therein," *P.R. Laws Ann.*, title 31 section 4876, and must be interpreted restrictively. *Rieder v. Torruella*, 47 P.R.R. 644 (1934); *cf. Lawrence Systems, Inc. v. Ramírez de Arellano*, 415 F.Supp. 54, 59 (D.P.R.1976) (a guaranty should be construed strictly in favor of the guarantors); *P.R. Laws Ann.*, title 31 section 3101 (joint and several obligations must be expressly made); *Stubbe Bros., Inc. v. Díaz*, 43 P.R.R. 79 (1932) (a promissory note signed by various debtors where it is not expressly stated that they are bound *in solido*, is presumed to be undertaken jointly only and not jointly and severally). *See also Williston On Contracts*, section 625 p. 829–29 (3rd Ed.1961). Even if the reference to "any debt," the specific reference to the housing project financing and to the loan and pledge agreement, and the revocation provision were found sufficient to create an ambiguity in the contract's terms requiring that the intention of the parties be inquired into, *see P.R. Laws Ann.*, title 31 section 3471, the documents provided by defendants show that approximately two years later, upon construction of an extension to the María del Carmen project, a different loan and pledge agreement between B & R and Girod was entered into and *another* "continuing" letter of guaranty with a different maximum amount of liability corresponding to the new amount and containing the same limiting language as to the financing of the

---

2. Plaintiff relies on the following wording:
   In order to induce you from time to time, at your option, to make loans or advances to, or at the request of Bracero & Rivera, Inc. ... the undersigned and each of them hereby guarantee jointly and severally with the bor-

rower [B & R] prompt payment at maturity to you or your successors and assigns of each and every such loan advance, credit and any obligation hereinabove referred to and also of any other debt, of any nature which the borrower may now or hereafter owe you....

project, was issued contemporaneously by the Riveras. If the parties' intent was to enter into an all encompassing personal guaranty covering any and all future disbursements to B & R, regardless of the construction project involved and if the guarantors had to issue a formal revocation in order to terminate the guaranty, as FDIC argues, why then did they enter into a second guaranty agreement only two years later for the construction of an extension of the very same project. Certainly the parties' acts, at least as shown by the documents submitted by defendants, reveal otherwise. FDIC has not presented any other document or sworn statement to rebut defendants' contention or to support its continuity theory. *See also P.R. Laws Ann.*, title 31 section 3478 (ambiguous clauses are interpreted against the party creating the ambiguity). In short, we find that FDIC has failed to establish the existence of genuine issues of fact in relation to defendants' motion for summary judgment as required by Rule 56, Fed.R.Civ.P., and its case law *see e.g. Hanh v. Sargent*, 523 F.2d 461 (1st Cir.) *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1975) or that movants are not, as a matter of law, entitled to summary judgment in their favor. *Id.* The Motion for Summary Judgment filed by defendants José R. Rivera-Arroyo, Myrna Landrón-Náter and the conjugal partnership established by them, is hereby GRANTED. Partial judgment shall be issued dismissing the complaint against these three defendants.

■ As to defendant B & R's motion, although we agree with its contention that there is no support in the record or the pleadings to bind it, as a joint and several debtor, to the obligations incurred by DI as a result of disbursements made by Girod

*after* DI entered into the Loan and Pledge Agreement and pursuant to this instrument, we do find that there are genuine issues of fact, mainly, whether B & R is still liable for the prior debts it incurred with Girod in relation to the Arecibo project, not as a joint and several debtor but as a debtor whose liability has not been discharged by the creditor upon assumption of the debt by a new debtor. As stated by FDIC in its opposition, B & R entered into a financial arrangement with Girod and executed a mortgage note for two million dollars payable to bearer on demand, which FDIC now holds and seeks to enforce. There is no indication in these documents or elsewhere in the record that FDIC expressly released B & R from its liability as evinced by this note. Although the law in Puerto Rico permits the release of a debtor's liability through the creditor's implicit acceptance of the new debtor in a situation where the mortgaged property was sold,[3] as appears to be the case here assuming the sale between B & R and DI was valid, the Supreme Court of Puerto Rico, interpreting the provision of the mortgage law permitting this "assumption of debt" mechanism, Article 164 Mortgage Law of 1979, *P.R. Laws Ann.*, title 30 section 2560 and the Civil Code's general provisions for novation of debt by substitution of debtor, *see* title 31 section 3243, has ruled that the question of implicit acceptance of the new debtor and release of the prior debtor requires a circumstantial assessment of the creditor's intent. *Teachers Annuity and Retirement System v. Candelario*, Supreme Court of Puerto Rico, R–82–456, opinion issued April 25, 1984 (84 JTS 31). According to this case, the facts and circumstances underlying the creditor's implicit acceptance of the new debtor and

---

**3.** Said article states:

When a mortgaged property is sold and the seller and the purchaser should have agreed that the buyer shall subrogate himself not only with respect to the liabilities derived from the mortgage, but also with respect to the personal obligations secured therein, the seller shall be released from said obligations, if the creditor gives his express or tacit consent.

If there was no agreement to convey the obligation, but the buyer has deducted this amount from the sale price, or retained it, even though it is not so stated in the deed, and when the obligation was due it was paid by the debtor who sold the property, the latter shall be subrogated in the creditor's place and stead until the purchaser reimburses the full amount owed.

release of the prior one must unequivocally reveal the creditor's intent to release the prior debtor and cannot be compatible with any other intention or be subject to different interpretations. *Teachers Annuity*, 84 JTS 31 at p. 3542. In *Teachers Annuity*, the court considered that the fact that the creditor accepted payments from the new debtor and demanded that he make them on time were insufficient to establish the creditor's unequivocal consent to release the prior debtor, *id.* The court concluded that these acts revealed other matters, such as the creditor's acceptance of payment from a third party, and not necessarily the release of the prior debtor. Given this ruling, we find that the acts that B & R claims are indicative of its "unequivocal" release by Girod, namely, the purchase of the mortgaged property by DI and the loan agreement between Girod and DI, merely reveal an independent purchase agreement between two parties, without Girod's participation or acceptance, and, a different loan issued by Girod to a new debtor without any reference to the prior debtor but not Girod's unequivocal will to consent to the release of B & R. The allegations as to B & R's liability, although not a model of clarity, do state that it subscribed a promissory note for two million dollars payable on demand and that FDIC is now the holder of this note. Although it is not expressly alleged, we can assume, in light of the favorable inferences standard required by Rule 56 F.R.Civ.P., that the obligations related to this note are derived from a valid debt, presumably, the disbursements made to B & R during its involvement in the Arecibo project from 1981 to 1984, which the FDIC (corporate) has acquired as assets from Girod, and that, in due course, the agreements evincing this arrangement, deeds number 213 and number 10, will eventually be produced. At this moment B & R has *not rebutted* FDIC's allegation that the two million note is outstanding and its argument that Girod released it from

liability is insufficient to justify summary dismissal.[4] Since B & R has not shown that there is *no issue of fact* on whether Girod implicitly consented to the release of B & R from any prior debt incurred in the Arecibo project, B & R's motion for summary judgment is DENIED insofar as this matter is concerned.

■ However, the motion is partially GRANTED as to those claims to recover from B & R, as a joint and several debtor, any debts incurred by DI as a result of the advances made by Girod to DI after May 18, 1984, the date on which the Loan and Pledge Agreement between DI and Girod was entered. Neither the record nor the pleadings reveal that B & R ever agreed to become a joint and several obligee of DI's debts with Girod in relation to those advances made after DI entered into the agreement with Girod. As we previously stated, joint and several liability must be expressly established and is not lightly presumed. See *P.R. Laws Ann.*, title 31 section 3101; *Stubbe*, 43 P.R.R. 79. Accordingly, all claims seeking recovery from B & R as an *in solido* debtor of DI for those loans made by Girod after May 18, 1984 are hereby DISMISSED. Partial judgment shall be entered accordingly.

We shall now consider the challenge of FDIC to the DI counterclaim and its related motion for summary judgment on its claim against DI. Basically, DI alleges in its counterclaim and argues in opposition to the motion for summary judgment that the May 1984 Loan and Pledge Agreement established bilateral obligations on both parties; that on Girod's part it had to continue providing financing until completion of the project. The counterclaim asks that the court declare that the contract created reciprocal duties which entitled DI to resolve it upon the other party's breach and it seeks an award of $139,503.00 for work performed and damages caused by FDIC's breach of the loan and pledge agreement in

---

4. FDIC has not moved for summary judgment as to this matter. We advance, however, that whatever document or act that defendant **B & R** may bring forth to establish the implicit release of liability must comply with 12 U.S.C. § 1823(e)'s disclosure, proof requirement and discussed further on.

failing to provide additional financing when requested. DI alleges that on August 24, 1984, when Girod was ordered by the Secretary of Treasury of Puerto Rico to cease operations, DI had fourteen houses ready for delivery in the Arecibo project. On September 13, 1984 it submitted to FDIC, in its corporate capacity, a request for payment of work performed pursuant to the terms of the pledge agreement. This, as well as a subsequent request, were rejected by FDIC. DI contends that on account of FDIC's actions, the Puerto Rico Housing Bank canceled its mortgage insurance commitment, it had to obtain alternate interim financing, and its relationships with trade contractors and suppliers were seriously impaired. DI also alleged that as of August 16, 1984 no notice of default had been issued by Girod and DI was complying fully with the terms of the agreement. According to the Loan and Pledge Agreement, to which the notes expressly refer, the maturity date for all the notes was May 1985 and the complaint was filed on January 1985.

Simply stated, FDIC's position is that it cannot be saddled with Girod's liabilities. It points out that actions involving the FDIC in its corporate capacity are governed by federal law and cites cases supporting the view that when FDIC in its corporate capacity acquires assets from a failed bank it is not a successor in interest of the bank and cannot be burdened with its liabilities. FDIC argues that whatever obligations Girod assumed under the Loan and Pledge Agreement with DI these cannot be imposed on it. In view of this "federal common law" doctrine precluding an action against the FDIC-corporate based on Girod's contractual liability with DI, FDIC further contends that there is no federal jurisdiction to entertain DI's counterclaim for if the action were one against FDIC-receiver (which is not a party), 12

U.S.C. section 1819 would preclude federal question jurisdiction and, if it were some sort of tort claim, the exhaustion requirements of the Federal Tort Claims Act, applicable to tort actions against FDIC-corporate, have not been met.

FDIC's position is derived from the Supreme Court's ruling in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench*, a nascent FDIC was trying to collect a promissory note it had acquired from a federal insured bank as part of its statutory duties. The debtor alleged that the note was given without any consideration whatsoever and with the understanding, acknowledged in a receipt stating that the notes would not be called for payment, that no suit would be brought thereon. FDIC had no knowledge of the existence of these receipts nor of the internal arrangement between the bank president and the debtor. An issue arose as to what law was applicable and it was ruled that federal law controlled.[5] In finding that the undisclosed dealings between bank and debtor could not be used to defeat FDIC's rights, the Court referred to the federal policy protecting FDIC against misrepresentations as to the securities or other assets in the portfolios of the banks which it insures, as discussed in *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940). The Court said at page 462:

If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed and fraudulent arrangement which the statute condemns and which the maker of the note made possible. The federal policy under this Act of protecting respondent in its various functions against such arrangement is no less clear or emphatic than the federal policy of outlawing purchases by

---

5. Justice Frankfurter concurred arguing that the application of either of the state laws involved, Missouri and Illinois, have resulted in the same result reached by the majority. Justice Jackson's concurring opinion discussed the desirability of applying federal law to this matter

because the case arose under a federal law and federal law could be applied by resorting to the general sources of the common law which may be appropriate to effectuate the policy of the Act. One of these sources is state law.

a bank of its own stock involved in the *Deitrick* case.

The *D'Oench* doctrine was codified in 12 U.S.C. section 1823(e) which provides:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

When FDIC in its corporate capacity acquires assets of a failed bank it does so as part of several financial arrangements it may engage in to assure that the insured depositors are reimbursed as quickly as possible and that the bank's losses are minimized and recovered expeditiously. *Federal Deposit Ins. Corp. v. La Rambla Shopping Center, Inc.*, 791 F.2d 215 (First Cir.1986). In carrying out these endeavors, FDIC is merely fulfilling its statutory duties of bolstering the stability of the nation's banking and credit system. *See gen. FDIC v. Philadelphia Gear Co.*, — U.S. —, — — —, 106 S.Ct. 1931, 1934–35, 90 L.Ed.2d 428 (1986), *and D'Oench*, 315 U.S. at 472, 62 S.Ct. at 686 (concurring opinion by Jackson); *Gunter v. Hutcheson*, 674 F.2d 862, 870 (11th Cir.1982). Section 1823(e) then

> protects the FDIC when, as a corporation, it buys assets, say, from itself as a bank's receiver, against the risk that those assets come accompanied with liabilities that the FDIC cannot readily ascertain from its examination of the bank's books. Such protection is important. The FDIC, when considering, for

example, whether to liquidate a failed bank or to structure the more desirable "purchase and assumption" arrangement, must determine whether the later arrangement is "reasonably necessary to save the cost of liquidating, including paying the injured accounts." 12 U.S.C. section 1823(c)(4)(A). It can fulfill this section 1823(c) requirement, making the "cost saving" determination with the necessary speed, only if it can rely "on the books and records of the failed bank to estimate what assets would be returned by a purchasing bank and to estimate which of those assets ultimately would be collectible." *Gunter v. Hutcheson*, 674 F.2d at 870.

*La Rambla*, — U.S. at pp. — – —, 106 S.Ct. at pp. 1935–36. In view of the particular circumstances and federal policies involved in the acquisition of assets procedure, it would be erroneous to consider that when FDIC, as a corporation, acquires certain assets of a failed bank it simply "step[s] into the private shoes of" the failed bank, *id.*, and can be held accountable for all the liabilities of the bank. This much of plaintiff's argument we concede.

However, the recognition of this unique position has prompted some courts to extend the special protection of section 1823(e) to entirely preclude the defense of usury against FDIC as a corporation, *Federal Deposit Ins. Corp. v. Tito Castro Const., Inc.*, 548 F.Supp. 1224 (D.P.R.) *aff'd.* 741 F.2d 475 (1st Cir.1984); *Matter of Charter Executive Center Ltd.*, 34 B.R. 131 (Bky.Ct.M.D.Fla.1983); or the defense of fraud *Federal Deposit Ins. Corp. v. Rockelman*, 460 F.Supp. 999 (E.D.Wisc. 1978), *but see, Federal Deposit Ins. Corp. v. Kucera Builders*, 503 F.Supp. 967, 971 n. 2 (N.D.Ga.1980). Some courts have even concluded that set-off or recoupment type counterclaims for the liabilities of the failed bank cannot be asserted against FDIC in its corporate capacity. *Dominguez v. FDIC*, 90 F.R.D. 595 (D.P.R.1981); *Federal Deposit Ins. Corp. v. De Jesús Vélez*, 514 F.Supp. 829, 835 (D.P.R.) *aff'd.*, 678 F.2d 371 (1st Cir.1982); *Federal Deposit Ins. Corp. v. James T. Barry Co.*, 453

F.Supp. 81 (E.D.Wisc.1978); *Federal Deposit Ins. Corp. v. Vogel,* 437 F.Supp. 660 (E.D.Wisc.1977); *see also Federal Deposit Ins. Corp. v. Smith,* 466 F.Supp. 843. The reasoning behind this total immunization is not related to any specific FDIC or federal policy but to the sovereign immunity qualities of FDIC-corporate as an agency of the United States, and its limited consent to be sued, *see In Re Franklin Nat. Bank Securities Litigation, Robert Gold,* 445 F.Supp. 723 (E.D.N.Y.1978), as well as to the statute's division of duties and capacities between the FDIC-corporate and the FDIC-receiver. *Domínguez,* 90 F.R.D. at 598 and the general "policy" behind section 1826(e) *id.* Proponents of this view argue that the proper party against whom such an action may be asserted would be the receiver of the bank which, if it were the FDIC, 12 U.S.C. section 1819 would divest the action of its federal question jurisdiction and would probably result in the action being prosecuted in the state court according to state laws on bank receivership. *See P.R. Laws Ann.,* title 7 sections 201, *et seq.; cf. Federal Deposit Ins. Corp. v. Willis,* 497 F.Supp. 272, 277–78 (S.D.Ga.1980) (claims could not be asserted against FDIC in its corporate capacity because Georgia law provides exclusive procedure against bank's receiver for such claims). It is also argued that permitting these debtors to assert such claims against the bank in collection suits by FDIC in its corporate capacity would thwart the receivership proceedings by placing the counterclaimant-debtor in a privileged status over the rest of the creditors who would have to claim their credits within the receivership proceeding. *Domínguez,* 90 F.R.D. at 598.

On the opposite end of the spectrum are those courts that have limited the protection of section 1823(e) to those defenses and claims that are based on agreements that do not meet the requirements of the statute. *Federal Deposit Ins. Corp. v. Meyer,* 578 F.Supp. 147 (N.D.Ill.1983); *Riverside Park Realty Co. v. Federal Deposit Ins. Corp.,* 465 F.Supp. 305 (M.D.Tenn.1978). These cases have permitted defenses and counterclaims against the FDIC based on rights and duties arising from the face of the assets acquired by the FDIC. *See F.D.I.C. v. Merchants Nat. Bank of Mobile,* 725 F.2d 634, 639. In *Howell v. Continental Credit Corp.,* 655 F.2d 743, 747 (7th Cir.1981) the court indicated that section 1823(e) does not apply when the same asset the FDIC is attempting to recover reveals bilateral obligations and the debtor asserts a breach thereof. Although the First Circuit has not expressly ruled on this issue (*De Jesús* was affirmed on other grounds), two recent opinions shed some light on its approach to the problem. In *La Rambla,* the debtor's counterclaims were not dismissed because they were based on liabilities of the failed bank but because the Court concluded, after assessing the counterclaims *in light of the statute's enumerated requirements,* that these were derived from agreements which did not meet the requirements of section 1823(e). Likewise, *Federal Deposit Ins. Corp. v. Roldán Fonseca,* 795 F.2d 1102 (1st Cir. 1986) the summary dismissal of the debtor's counterclaims seeking annulment of the loan agreements was affirmed because the basis of said claims was an oral agreement and section 1823(e) required such agreement to be in writing in order for them to be valid against the FDIC-corporate's acquired assets. *Id.* at 1107.[6] It is significant that in both of these cases the court determined whether the agreements

---

6. In *Roldán Fonseca* the court also refused to allow the defense of equitable estoppel against FDIC because of the Supreme Court's disapproval of applying said defense against the government. *Id.* at p. 1108. The circuit court rejected the distinction advanced by the Eleventh Circuit in *Federal Deposit Ins. Corp. v. Harrison,* 735 F.2d 408 (1984), that the defense may be applicable to commercial type transactions by government agencies rather than the usual sovereign type ones, because the Supreme Court had found no merit in this distinction. However, the circuit court did not foreclose entirely the applicability of said equitable defense against FDIC-corporate under "other circumstances." *Id.* at p. 1108, n. 6. The instant case, of course, involves statutory based contractual defenses and no equitable ones have been asserted.

complied with the express, enumerated requirements of section 1823(e) instead of simply dismissing the counterclaims on some ill-defined immunity-to-counterclaim doctrine.

Equally significant is the often cited concurrent opinion by Justice Jackson in *D'Oench* which made it clear that when FDIC acquired assets from a failed bank, it "would succeed only to the rights which the bank itself acquired where ordinary and good-faith commercial transactions are involved." *Id.* 315 U.S. at 474, 62 S.Ct. at 687. The Court in *D'Oench* did not seek to infuse rights not included therein. Its ruling was aimed at preventing secret agreements which could pass undetected by the FDIC in its expeditious asset gathering and collecting activities. There is also no provision in the statute nor any statement in its legislative history suggesting that such augmentation of rights on the assets acquired is warranted. On the contrary, application of general principles of statutory construction section 1823(e) implies that agreements which comply with the four enumerated requirements of the statute *may* be opposed against FDIC, as a corporation, to defeat its right, title or interest in the asset acquired. *See Williams v. Wohlgemuth,* 540 F.2d 163, 169 (3rd Cir.1976); *cf. Andrus v. Clover Const. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not implied, in the absence of evidence of a contrary legislative intent"). Just as FDIC's efforts to recover the failed bank's losses and fulfill its statutory duties cannot be curtailed by agreements not meeting 1823(e) requirements, the assets it acquires cannot be expanded beyond their apparent face value, nor can the debtor's rights arising thereunder be eviscerated under the guise of some undefined federal policy.

*Cf. F.D.I.C. v. Panelfab,* 739 F.2d 26 (1st Cir.1984) (FDIC cannot claim protection of section 1823(e) to invalidate the same agreement on which it bases its right to collect); *Santoni v. Federal Deposit Ins. Corp.,* 677 F.2d 174 (1st Cir.1982) (FDIC-corporate's contractual liability is the same as that of a private party). Plaintiff's reliance on section 1823(e) to "immunize" it from DI's counterclaim is misplaced for this section will not shield it from those defenses or claims which arise from the face of the same asset it seeks to collect and it will not shield it from those defenses derived from agreements that meet section 1823(e) requirements. The construction of this statute and the federal policy behind it in the manner suggested by plaintiff, that is, as an impermeable barrier to any defense asserted against FDIC in an asset collection action, is not supported by the statute, its history or persuasive caselaw.[7] Furthermore, no specific authorities or convincing arguments, other than the general "FDIC-is-not-the-successor-of-a-failed-bank" argument, have been presented in support of such a broad interpretation. The assets acquired by FDIC which it seeks to collect in this action, the promissory notes, each make an express reference to the Loan and Pledge Agreement of May 1984. Even plaintiff's complaint mentions this agreement and relies on it in asserting the claim. FDIC's position that we should simply ignore the terms and conditions of the Loan and Pledge Agreement and let it collect on the notes, notwithstanding any valid defense that DI may raise pursuant to that agreement, cannot be seriously considered. It is but a poor attempt to skirt the difficult issues raised by DI. FDIC has not attacked the Loan and Pledge Agreement as failing to meet the requirements of section 1823(e). If this agreement does in fact diminish or extinguish the asset, then

7. Most of the district court cases cited by plaintiff appear to rest their holding on alternate grounds related to the defendant-debtor compliance or lack thereof with section 1823(e)'s requirements. As to Judge Pérez-Giménez' opinion in Civil 85–611, we have not been placed in a position to examine it properly and incorporate it in our analysis for neither the complaint, answer, counterclaim or the agreement relied on by the debtor therein have been proven and such data cannot be discerned from the opinion.

it may be opposed by DI to reduce or cancel the debt.

■ However, this does not mean that the particular legal conclusions that DI has reached by applying the terms of the agreement are correct. After engaging in the analysis which FDIC did not even attempt to do, we find that DI's contention that FDIC assumed all of the failed bank's reciprocal duties under the original agreement is equally untenable for it ignores the circumstances surrounding FDIC's acquisition of the assets and the nature and terms of the agreement itself. That FDIC as a corporation, in acquiring the assets of a failed bank cannot be considered a legal successor of the failed bank so as to be "saddled" with the bank's liability is a long standing principle in this area of federal law, established since the *D'Oench* ruling, which DI cannot seriously question. That part of the counterclaim which seeks contractual damages [8] from FDIC due to Girod's failure to provide further financing of the project meets head-on with this essential principle. This part of DI's counterclaim is really based on the premise that FDIC is the legal successor to Girod and all of its liabilities and that when FDIC acquired the assets it really purchased Girod's participation in an ongoing agreement with a construction developer to provide financing until completion of the project. There is nothing in the record to suggest that when FDIC, as a corporation, acquired the assets it also agreed to embark on such a business venture. Imposing these liabilities on FDIC based merely on the acquisition of the assets would, in effect, "saddle" FDIC with Girod's liabilities and enable the failed bank "creditors" to file suit against FDIC when, in fact, these are really claims against the failed bank that, in fairness to the rest of its creditors, are best channeled through the receivership proceedings. The counterclaim, however, also requests a declaration on the effectiveness of the acquired asset sought to be collected. Nevertheless, that part of DI's counterclaim which seeks to limit its liabilities on the notes to the terms and conditions of the Loan and Pledge Agreement would not result, as DI believes, in exempting it from its liabilities on the amounts it borrowed. This is so not because of some ill-defined FDIC immunity, but because, even considering the terms and conditions of the Loan and Pledge Agreement incorporated in the notes, DI's interpretation of the contractual duties arising therefrom is erroneous. In the first place, we have serious doubts whether the specific allegations in the loan agreement that DI counterposes as reciprocally demandable partake of the reciprocity contemplated by Article 1053 of the Civil Code, namely, that which enables one of the parties to cancel, *rescindir*, the contract upon the other party's failure to comply with the counter, reciprocal obligation.[9] In order for the implied right to rescind to exist, the mutual obligations must be so interdependent that one is the consequence of the other. *Municipality v. Vidal*, 65 P.R.R. 346, 350–55 (1945). The mutual obligations must be of a reciprocity so complete that it makes both relations arise from one cause, each obligation being a condition to the other. *Id.; Ramos v. Avilés*, 58 P.R.R. 731–732 (1941) *see gen.:* Manresa, *Comentarios al Código Civil*

---

8. In response to FDIC's argument that if the action for damages against it were one in tort, the exhaustion requirements of the F.T.C.A. had not been complied with, DI indicated in its opposition to plaintiff's request to dismiss the counterclaim, that the counterclaim was not one in tort, but rather one in contract.

9. Article 1053, *P.R. Laws Ann.,* title 31 section 3052 provides that: "The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent of him."

As mentioned in *D'Oench,* resort to state law to determine the rights and duties of the parties involved may be necessary and advisable on many occasions, *id.,* 315 U.S. at 474, 62 S.Ct. at 687. One of the sources of common law is state law, especially when the parties relied on said law for the establishment of their rights. *See American Nat. Bank v. Federal Dep. Ins. Corp.,* 710 F.2d 1528, 1534, n. 7 (11th Cir.1983); *Riverside Park,* 465 F.Supp. at 309. Plaintiff has not argued that the parties herein did not rely on Puerto Rico law when entering into their obligations.

*Español,* Tome VIII, Vol. 1, pp. 406–436 (6th Ed.1967). In view of their common origin, consequential relationship and interdependent execution, reciprocal or mutual obligations which give right to the *exceptio non adimpleti* resolution are generally performed in a single act. *See* Castán Tobeñas, J., *Derecho Civil Español, Común y Foral,* Tome III, pp. 120–130 (12th Ed.; Reus, Madrid) and *Vidal,* 65 P.R.R. at 352 (quoting Manresa). Besides establishing the special reciprocal characteristic of the obligation, the party asserting the right must be free of liability and must show that the other party failed to comply with the obligation. *See* Castán; Manresa, *supra.* It is also important to note that if a contract is canceled or rescinded by way of the resolutory provision of Article 1053 the parties return to their original pre-contract stage and must restitute whatever had been interchanged or performed before the contract was canceled. *Idem.*

▮ In this case, it is difficult to conceive the loan agreement obligations which DI has characterized as reciprocal to be of a truly interdependent nature. Basically, the agreement contains a series of loan transactions. A loan is typically characterized as a unilateral type of obligation, rather than bilateral, which is perfected when the money is handed to the debtor. *See P.R. Laws Ann.,* title 31 sections 4511, 4571–4575 and Castán, *supra,* Tome IV, p. 434 (10th Ed. Reus, Madrid). It is clear from the document that Girod and DI entered into an agreement whereby a series of loans were to be given over a period of time, but each loan was perfected when the advance was made. To say that repayment of an early advance was *reciprocally* conditioned on the delivery of a future loan, so as to enable the debtor to cancel the earlier, already perfected loan, is to stretch Article 1053 beyond its intended scope. Furthermore, assuming the parties intended by the agreement to move away from the typical unilateral loan obligation, the

terms of the agreement [10] fail to support the reciprocity attributed to these typically, non-reciprocal obligations. Although the agreement does manifest that Girod was obliged to provide continued financing over a period of twelve months and up to a limited amount, if certain conditions were met by DI (mainly, construction specification requirements), there is nothing in the agreement suggesting that repayment of the amounts initially advanced was conditioned on providing additional financing. On the contrary, the agreement sets a maturity date for any and *all* advances made, twelve months after the parties entered into the agreement, and the maturity date of each and every advance made is not conditioned on Girod's having provided all the amounts agreed to. That is, as evinced by the agreement, any advances made became due on May 1985. Nothing, save the twelve months, conditioned repayment of whatever advances were made. It should be noted that the maturity date on any advance made could be accelerated before the twelve month period expired, if certain conditions were not met by DI. It is also worth noting that each amount advanced was evidenced by a separate promissory note and that the many conditions and specifications that DI had to comply with before obtaining further advances in any construction project reveal that the possibility that the entire amount of the loan would not be disbursed in the twelve month period was contemplated and no provision was made to suspend collection on the separate advances disbursed when they matured pending distribution of the entire proceeds of the loan beyond the date of maturity. The nature of the obligations involved and their description, according to the terms of the agreement, militate against their being considered reciprocal, as by DI.

▮ In addition, DI's reliance on the entire agreement, as originally conceived in May 1984, to juxtapose Girod's future obligations against the initial advances, ig-

---

**10.** DI has not provided any other document meeting the requirements of section 1823(e)

that would buttress its reciprocity theory or also work to diminish the assets' value.

nores the circumstances arising later: Girod's demise and the closing of its banking operations. When in August 1984 the Secretary of the Treasury of the Commonwealth of Puerto Rico ordered Girod to cease and desist all of its banking activities and placed it under a receivership, the rights and obligations contained in the periodically performed agreement between DI and Girod were radically affected. According to Puerto Rico law, Girod could no longer conduct the type of activity which DI alleges it had to perform on a reciprocal basis under the agreement, that is, to loan more money. *See P.R. Laws Ann.*, title 7 sections 201, 203, 204a (operations of bank closed and placed in receivership by Secretary of Treasury managed by receiver; criminal fines and penalties imposed, if otherwise); title 31 sections 3044, 3193, *Rodriguez v. Municipality*, 75 D.P.R. 479 (1953), Manresa, *supra*, at p. 761 (obligations extinguished when their performance would be illegal). Given these circumstances, it is difficult to perceive the continued validity of the rest of the agreement, or, for that matter, Girod's "failure to comply" with the supposedly reciprocal future advances.[11] Therefore, at the time FDIC acquired Girod's assets, the point in time when the rights of the parties are fixed, *see American Nat. Bank v. FDIC,* 710 F.2d 1528, 1540 (11th Cir.1983), the remainder of whatever rights and duties the agreement contained were suspended indeterminately. FDIC's acquisition was then limited to whatever assets were produced by that part of the agreement that could and, in fact, was performed at that time. Those assets consisted in whatever amounts had been disbursed and were owed by DI upon maturity. Finally, even assuming that repayment of the loan was conditioned on further advances, given the receivership of Girod, DI would only be entitled to resolu-

tion of the contract which would require that it return the amounts advanced. *See* Manresa, *supra* at p. 427. We thus conclude that the obligations here involved did not entitle DI to rescind its obligation to repay the amounts advanced and their ensuing interest,[12] as evidenced by the promissory notes acquired by FDIC. DI's defenses and counterclaim against FDIC's collection of these notes are not supported by the documents on record which comply with section 1823(e) and, therefore, its counterclaim is DISMISSED. FDIC's motion for summary judgment and to dismiss DI's counterclaim are GRANTED. Partial judgments shall be entered accordingly.

The claims remaining in this action, FDIC's action against the Pranns and their conjugal partnership for DI's liabilities and FDIC's action against B & R for their liability prior to May 1984 related to the Arecibo project, are hereby set for **a status conference on November 14, 1986 at 9:00 AM.** They will be set for trial shortly thereafter.

SO ORDERED.

## PARTIAL JUDGMENT

Pursuant to the Opinion and Order of this same date, the complaint filed against defendants José R. Rivera-Arroyo, Myrna Landrón-Nátor and the conjugal partnership established by them is hereby DISMISSED; the counterclaim filed by Development and Investment Corp. against the Federal Deposit Insurance Corporation is hereby DISMISSED and it is hereby declared that Development and Investment Corp. is liable to the Federal Deposit Insurance Corporation for an amount to be determined at a later date. It is also hereby declared, pursuant to the above-mentioned Opinion and Order, that Bracero and Riv-

---

**11.** We express no view on whether DI may assert a valid cause of action based on the responsibility of Girod, its officers or directors for the bank's failure and the damages caused.

**12.** Even though DI is correct in asserting that FDIC was hasty in bringing suit against them, for the notes had not matured at the time of filing of the complaint, their having become due

a few months later during the course of these proceeding makes their argument academic and of no consequence for, according to the terms of the agreement, the notes start accruing interest upon disbursement of the advances and not upon maturity. *See* Loan and Pledge Agreement Clause 4, p. 5.

era, Inc. is not liable for the debts incurred by Development and Investment Corp. as a result of any disbursements made pursuant to the loan and pledge agreement between Development and Investment Corp. and Girod Trust Company and those claims are hereby DISMISSED.

SO ORDERED AND ADJUDGED.